Filed 10/23/20

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| KATHLEEN CARROLL, | C083250 |
| Plaintiff and Respondent, | (Super. Ct. No. 34201200135527CUOEGDS) |
| v. | |
| COMMISSION ON TEACHER CREDENTIALING et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, David I. Brown, Judge. Reversed.

Siegel, Yee & Brunner, Dan Siegel and Micah Clatterbaugh, for Plaintiff and Respondent.

Xavier Becerra, Attorney General, Chris A. Knudsen, Senior Assistant Attorney General, Kristin M. Daily, Supervising Deputy Attorney General, Jerry J. Deschler, Deputy Attorney General, for Defendants and Appellants.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts I and II of the Discussion.

1

SUMMARY OF THE APPEAL

Plaintiff Kathleen Carroll sued her former employer, defendant California Commission on Teacher Credentialing (Commission), for terminating her employment in retaliation for her reporting Commission mismanagement to the state auditor. Prior to bringing this action, plaintiff appealed her termination to the State Personnel Board (Board), claiming the Commission fired her in retaliation for her whistleblower activities. She also filed a separate whistleblower retaliation complaint with the Board. The Board denied her claims.

In this action, plaintiff alleged the Commission's termination of her employment violated the California Whistleblower Protection Act (Gov. Code, § 8547 et seq., the Act), Labor Code section 1102.5, and 42 U.S.C. section 1983 (section 1983). (Statutory section references that follow are to the Government Code unless stated otherwise.) After the Commission removed the matter to federal court, the district court dismissed the section 1983 claim and remanded the matter to state court. A jury found for plaintiff and awarded her substantial damages.

The Commission appeals. It contends (1) the district court's judgment is res judicata as to this action; (2) the Board's decisions collaterally estop this action; (3) the trial court abused its discretion in evidentiary matters by (a) permitting plaintiff's counsel to question witnesses on and asking the jury to draw negative inferences from the Commission's exercise of the attorney-client privilege, (b) denying the admission of the Board's findings and decisions, (c) denying the admission of after-acquired evidence, and (d) denying the admission of evidence mitigating plaintiff's emotional distress; and (4) the damages award was unlawful in numerous respects.

We reverse the judgment.

Although the district court's judgment was not res judicata and the Board's decisions did not collaterally estop this action, the trial court committed prejudicial error

2

when it allowed plaintiff's counsel to question witnesses on and ask the jury to draw negative inferences from the defendants' exercise of the attorney-client privilege and did not timely instruct the jury with the mandatory curative instruction provided in Evidence Code section 913. Because we reverse on this ground, we do not address the Commission's other claims of error.

## FACTS AND PROCEEDINGS

Plaintiff began working for the Commission in 2006 as a staff counsel. She was assigned to support the Commission's Committee on Credentials (Committee). The Committee reviews discipline cases and makes recommendations to the Commission for appropriate discipline against credential holders.

In 2009, plaintiff discovered that the Commission had a backlog of reports and cases of teacher misconduct. She raised her concerns with her direct supervisor, assistant chief general counsel and defendant Lee Pope, but he took no action. In a meeting with a member of the Commission, plaintiff alleged that defendant Mary Armstrong, the Commission's general counsel, had lied to the Commission about the backlog in August 2009. In a meeting with Dale Janssen, the Commission's executive director, plaintiff said that some serious discipline cases had not been reviewed for two years.

In January 2010, Janssen informed Crista Hill, the director of the Commission's administrative services division, of plaintiff's complaint. The Commission hired an independent investigator to investigate plaintiff's allegations. That investigation began February 1, 2010.

On March 8, 2010, the investigator complained to Hill about plaintiff's behavior toward her. The investigator also forwarded a letter from plaintiff's union representative written on February 12, 2010, in which the representative complained about how the investigator had conducted her interview of plaintiff. Plaintiff had informed the representative that if the interview was indicative of how the investigator intended to

3

investigate plaintiff's concerns, "it would perhaps be best if the Bureau of State Audits were asked to investigate at this time."

The union representative's letter did not disclose that plaintiff had already called the Bureau of State Audit's whistleblower hotline in December 2009 and reported the backlog. She was told to contact her state senator to request a program audit. In February 2010, plaintiff contacted then-Senator Darrell Steinberg's office, and the senator requested the Joint Legislative Audit Committee to authorize an audit of the Commission. That committee approved the audit request in May 2010.

From July to September 2010, plaintiff met with the state audit's team leader six times after work hours. She also gave the team leader hundreds of Commission documents at his request.

Meanwhile, Hill responded to the union representative's letter of February 12 by sending a letter dated March 15, 2010 to plaintiff. Hill expressed her concern about plaintiff's lack of cooperation with the investigator, and she informed plaintiff that continued failure to cooperate with the investigation would result in future disciplinary action.

On June 7, 2010, Hill forwarded the union representative's February 12 letter to Janssen, Armstrong, and others. The next two days, June 8 and 9, Hill and Armstrong began conversations and exchanged emails about seeking legal advice from the Department of Personnel Administration (DPA). That agency provides legal advice to the Commission on all personnel matters. Janssen and Pope were also involved in these communications. Armstrong stated their questions to DPA were about ethical concerns they had regarding plaintiff and her role as a Commission attorney.

The Commission's human resources manager, Katrina Hollingsworth, participated in two meetings in June 2010 where plaintiff was the topic. In the first meeting, Armstrong, Pope, Hill, and Hollingsworth met with an attorney with DPA. In the second June meeting, Janssen, Armstrong, Pope, Hill, and Hollingsworth met, and they decided

4

to lay off plaintiff. Armstrong testified that this meeting was part of a budgeting exercise required by the Department of Finance due to the state's fiscal crisis. Hollingsworth stated the layoff was not a disciplinary action. Hill directed Hollingsworth to move forward with the layoff, but Hollingsworth never received from Hill a required justification for the layoff based on a budget shortfall.

Janssen, Armstrong, Pope, Hill, and Hollingsworth met again in September 2010. The layoff process was taking too long, and they decided to bring an adverse action against plaintiff. Pope took the lead by interviewing Commission employees to document plaintiff's behavior and by writing a rough draft of the notice that would be delivered to plaintiff. Hollingsworth compiled the documentation and wrote another draft of the notice. She saw there was no documentation of progressive discipline against plaintiff.

On November 16, 2010, the Commission terminated plaintiff's employment. The notice of adverse action stated that during her employment, plaintiff had pursued inappropriate personal and romantic relationships with members of the Committee, encouraged a Committee member to disregard Commission confidentiality provisions, acted rudely toward Committee members and coworkers, refused supervisors' instructions on several occasions, made disparaging remarks to other employees about coworkers and supervisors, and failed to complete several work assignments.

Approximately five months later, on April 7, 2011, the state auditor released the audit of the Commission. Confirming plaintiff's allegations of misconduct, the audit found delayed processing of teacher misconduct cases, serious charges of misconduct in some of the backlogged cases, fear of retaliation among Commission staff, nepotism and favoritism in hiring and promotion, an inaccurate database used to monitor the caseload, and unauthorized closing of cases without required Committee review.

5

Plaintiff appealed her termination to the Board in November 2010. She contended the Commission and her supervisors retaliated against her in part for raising concerns about the backlog of discipline cases.

In March 2011, plaintiff also filed a whistleblower retaliation complaint with the Board pursuant to section 8547.8, part of the California Whistleblower Protection Act (§ 8547 et seq.). The Board consolidated the appeal and the complaint, and an administrative law judge held an evidentiary hearing on both matters over 11 days between July 2011 and January 2012.

The Board upheld plaintiff's termination and denied her whistleblower complaint. As to the termination appeal, the Board found that plaintiff had committed serious misconduct and that dismissal was an appropriate penalty. The Board rejected plaintiff's affirmative defense of retaliation. It found that "clear and convincing evidence showed" that the Commission did not retaliate against plaintiff.

As for the whistleblower complaint, the Board found that plaintiff failed to prove that her disclosures of mismanagement were a contributing factor in her termination and that her termination was in retaliation for her disclosures.

Plaintiff did not seek a writ of mandate to review the Board's decision. Instead, she filed this action in Sacramento County Superior Court and sought damages under the Act, Labor Code section 1102.5, and section 1983. In addition to suing the Commission, plaintiff sued Armstrong, Pope, Janssen, Hill, and another employee in their individual capacities. Only the Commission, Armstrong and Pope remained as defendants at the time of judgment in this matter.

The Commission removed the action to federal court based on federal question jurisdiction. There, it moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. It argued that res judicata barred litigating claims already decided by the Board.

6

The district court granted the motion in part. It dismissed plaintiff's section 1983 claim with prejudice, finding it was barred by the res judicata effect of the Board's hearing and decision. The court stated that res judicata barred plaintiff's section 1983 count because her whistleblower complaint before the Board litigated the same primary right—wrongful termination in retaliation for her disclosure of the Commission's backlog of disciplinary complaints. The court declined to exercise supplemental jurisdiction over plaintiff's state law claims, and it remanded the matter to the superior court.

At the conclusion of trial in superior court, the jury found for plaintiff on her whistleblower claims. It awarded her $2,094,528 in economic damages and $750,000 in noneconomic damages. It also awarded $90,000 in punitive damages against Armstrong and $130,000 against Pope.

Unless otherwise apparent from the text, we refer to the defendants collectively as the Commission.

## DISCUSSION

## I

### *Preclusive Effect of District Court's Decision*

The Commission contends the federal district court's order dismissing the section 1983 action and remanding the case to state court precluded plaintiff under the doctrine of res judicata from proceeding with her state law claims. The Commission argues that California res judicata law bars plaintiff's claims because the state claims relate to the same primary right resolved by the federal district court, the dismissal was a final judgment on the merits, and plaintiff was a party in the district court action. We conclude plaintiff was not barred from litigating her state claims in superior court.

A.    *Choice of law*

Both parties assume without discussion that California law determines the preclusive effect of the federal court's dismissal on plaintiff's state claims.  They are incorrect.  Federal common law determines the preclusive effect of a federal court judgment in state court.  (*Taylor v. Sturgell* (2008) 553 U.S. 880, 891 [171 L.Ed.2d 155] (*Taylor*); *Semtek Internat. Inc. v. Lockheed Martin Corp.* (2001) 531 U.S. 497, 507 [149 L.Ed.2d 32] (*Semtek*).)  We must first determine the federal common law that applies here.

In *Semtek*, the United States Supreme Court addressed the preclusive effect of federal judgments rendered in *diversity* cases.  The court declared that federal common law determined the preclusive effect of the federal judgment in state court.  (*Id.* 531 U.S. at pp. 507-508.)  It also declared, as a rule of federal common law, that the preclusive effect of a federal court judgment sitting in diversity would be determined under the law of the forum state, except where state law was incompatible with federal interests.  (*Id.* at pp. 508-509.)  The court explained, "Since state, rather than federal, substantive law is at issue there is no need for a uniform federal rule.  And indeed, nationwide uniformity in the substance of the matter is better served by having the same claim-preclusive rule (the state rule) apply whether the dismissal has been ordered by a state or a federal court.  This is, it seems to us, a classic case for adopting, as the federally prescribed rule of decision, the law that would be applied by state courts in the State in which the federal diversity court sits." (*Id.* at p. 508.)

In *Taylor*, the high court addressed the preclusive effect of federal judgments rendered in *federal question* cases.  It again held that federal common law governed, but unlike in *Semtek*, the court did not announce as a matter of federal common law that the forum state's law applied.  The court stated, "The preclusive effect of a federal-court judgment is determined by federal common law.  (See *Semtek,* [*supra*, 531 U.S. at

8

pp. 507-508.]) For judgments in federal-question cases . . . federal courts participate in developing 'uniform federal rule[s]' of res judicata, which this Court has ultimate authority to determine and declare. (*Id.* at p. 508.) The federal common law of preclusion is, of course, subject to due process limitations." (*Taylor, supra*, 553 U.S. at p. 891.)

Unlike here, *Taylor* did not involve pendent state law claims. The issue before the court was the preclusive effect of a federal judgment in a subsequent federal action brought by an unrelated party. (*Taylor, supra*, 553 U.S. at pp. 886-888.) In *Semtek*, however, the United States Supreme Court stated "that no federal textual provision addresses the claim-preclusive effect of a federal-court judgment in a federal-question case, yet we have long held that States cannot give those judgments merely whatever effect they would give their own judgments, but must accord them the effect that this Court prescribes. (See *Stoll v. Gottlieb* (1938) 305 U.S, 165, 171-172 [83 L.Ed. 104]; *Gunter v. Atlantic Coast Line R. Co.* (1906) 200 U.S. 273, 290-291 [50 L.Ed. 477]; *Deposit Bank v. Frankfort* (1903) 191 U.S. 499, 514-515 [48 L.Ed. 276].)" (*Semtek, supra*, 531 U.S. at p. 507.)

Insofar as this court is aware, the United States Supreme Court has not given any further direction on the federal common law that determines the preclusive effect of a federal court's dismissal of federal claims on state claims remanded to state court.

California courts attempting to find and apply the federal common law in this situation have reached different results. In *Hardy v. America's Best Home Loans* (2014) 232 Cal.App.4th 795 (*Hardy*), the court of appeal acknowledged that federal common law determined the preclusive effect in state court of a district court's judgment of dismissal of federal and state claims. (*Id.* at p. 805.) However, because the state action before it raised only the dismissed state claims, the court concluded that California preclusion law should control. The court reasoned that the district court's dismissal of state claims was like a district court's dismissal in diversity actions, and under *Semtek*,

9

the preclusive effect of a dismissal in diversity cases is determined by state law. (*Id*. at p. 806.)

In *Guerrero v. Department of Corrections & Rehabilitation* (2018) 28 Cal.App.5th 1091 (*Guerrero*), the court of appeal reached a different result. It held that only federal preclusion law determined the preclusive effect in state court of a federal dismissal of state claims where the district court sat in federal question jurisdiction. The court emphasized the United States Supreme Court's statement in *Taylor* that, in contrast to diversity cases, " '[f]or judgments in federal-question cases[,] . . . federal courts participate in developing "uniform federal rules[s]" of res judicata . . . .' (*Taylor, supra*, 553 U.S. at p. 891.)" (*Guerrero, supra*, 28 Cal.App.5th at p. 1101.) Unlike the *Hardy* court, the *Guerrero* court read *Taylor* "as an unequivocal directive that federal claim preclusion law applies . . . without reference to California law." (*Id*. at p. 1101.)

*Gurerrero* relied upon *Louie v. BFS Retail & Commercial Operations, LLC* (2009) 178 Cal.App.4th 1544 (*Louie*), a decision from this court, which held that a federal consent decree did not by its terms bar the federal plaintiff from pursuing his state law remedies in state court. The court stated, "[W]here a prior federal judgment was based on federal question jurisdiction, the preclusive effect of the prior judgment of a federal court is determined by federal law." (*Id*. at p. 1553, italics omitted.)

While the *Hardy* court's argument for applying state preclusion law in this instance arguably has some merit, we believe it is not our argument to make. The United States Supreme Court "has the last word on the claim-preclusive effect of all federal judgments." (*Semtek, supra*, 531 U.S. at p. 507, italics omitted.) And it is the federal courts who are to develop " 'uniform federal rule[s]' " of res judicata for federal-question cases. (*Taylor, supra*, 553 U.S. at p. 891.) For these reasons, we refrain from following *Hardy's* application of state preclusion law. Like *Guerrero* and *Louie*, we apply federal law to determine the preclusive effect, if any, of the district court's dismissal and remand of plaintiff's claims to state court.

10

B. *Analysis*

Under federal law, "[t]he preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.' Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.' (*New Hampshire v. Maine* (2001) 532 U.S. 742, 748 [149 L.Ed.2d 968].) Issue preclusion, in contrast, bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim. [(*Id.* at pp. 748-749.)] By 'preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate,' these two doctrines protect against 'the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions.' (*Montana v. United States* (1979) 440 U.S. 147, 153-154 [59 L.Ed.2d 210]." (*Taylor, supra*, 553 U.S. at p. 892, fn. omitted.)

Although the Commission asserts the district court judgment bars plaintiff's claims "under the doctrines of res judicata and collateral estoppel," it argues only that the claim is barred by res judicata which, in federal nomenclature, refers to claim preclusion. We thus address only whether the federal dismissal precludes plaintiff's claims in state court.

The United States Supreme Court has historically defined the elements of claim preclusion as follows: "The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.' (*Cromwell v. County of Sac* (1876) 94 U.S.

11

351, 352 [24 L.Ed. 195].) The judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment." (*Commisioner v. Sunnen* (1948) 333 U.S. 591, 597 [92 L.Ed. 898].)

The Commission contends the district court's dismissal satisfies each of the requirements for claim preclusion. The dispositive issue here is whether the federal order was a final judgment on the merits.

The Commission claims a federal dismissal for failure to state a claim is a final judgment on the merits for purposes of claim preclusion in state court. The United States Supreme Court, however, rejected this argument in *Semtek*. (*Semtek, supra*, 531 U.S. at pp. 501-506.) Neither the Commission, plaintiff, nor the cases the Commission cites mention *Semtek*. (See *del Campo v. Kennedy* (N.D. Cal. 2006) 491 F.Supp.2d 891, 901-902; *Esparza v. County of Los Angeles* (2014) 224 Cal.App.4th 452, 465-466; *Lumpkin v. Jordan* (1996) 49 Cal.App.4th 1223, 1230-1231.)

Although *Semtek* ultimately held that as a matter of federal common law, state law determined the preclusive effect of a federal diversity judgment, *Semtek* first rejected an argument that the federal court's dismissal of state claims was under federal law a judgment on the merits such that it had preclusive effect in state court.

In *Semtek*, the petitioner filed an action in California state court on state contract and tort claims. The respondent removed the case to federal district court in the Central District of California based on diversity jurisdiction. On respondent's motion, the district court dismissed the claims as time barred under California's two-year statute of limitations. The court dismissed the claims " 'in [their] entirety on the merits and with prejudice.' " (*Semtek, supra*, 531 U.S. at p. 499.) The federal appellate court affirmed. (*Ibid*.)

The petitioner then filed the same claims in Maryland state court where the respondent resided and where the claims were timely under Maryland's three-year statute

of limitations.  On the respondent's motion, the Maryland court dismissed the action based on res judicata.  It reasoned that federal law determined the preclusive effect of federal diversity judgments, and under federal law, the California district court's dismissal was on the merits and claim preclusive.  (*Semtek, supra*, 531 U.S. at p. 500.)

The United States Supreme Court ultimately disagreed with the Maryland court's understanding of federal law, but before doing so, it interpreted the phrase "upon the merits" for purposes of federal law.  The respondent argued that the high court should affirm the Maryland court's judgment giving preclusive effect to the district court's dismissal because rule 41(b) of the Federal Rules of Civil Procedure deemed the district court's dismissal to be " 'an adjudication upon the merits.' " (*Semtek, supra*, 531 U.S. at p. 501.)  At the time, rule 41(b) stated:  " 'Involuntary Dismissal:  Effect Thereof.  For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant. . . . [A]ny dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.' " (*Ibid.*)  Today, the rule similarly states that "any dismissal not under this rule—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits." (Fed. Rules Civ.Proc., rule 41(b), 28 U.S.C.)  Since the California district court's dismissal did not " 'otherwise specif[y]' " and did not pertain to the excepted subjects of jurisdiction, venue, or joinder, the respondent contended that the federal dismissal was an adjudication " 'on the merits' " under Rule 41(b) and was entitled to claim preclusive effect in the Maryland court.  (*Semtek, supra*, 531 U.S. at p. 501.)

"Implicit in this reasoning," the Supreme Court stated, "is the unstated minor premise that all judgments denominated 'on the merits' are entitled to claim-preclusive effect.  That premise is not necessarily valid.  The original connotation of an 'on the merits' adjudication is one that actually 'passes directly on the substance of [a particular]

13

claim' before the court.  (Restatement [(Second) of Judgments] § 19, Comment *a,* at p. 61.)  That connotation remains common to every jurisdiction of which we are aware.  [Citation.]  . . .  And it is, we think, the meaning intended in those many statements to the effect that a judgment 'on the merits' triggers the doctrine of res judicata or claim preclusion."  (*Semtek, supra*, 531 U.S. at pp. 501-502.)

"But over the years the meaning of the term 'judgment on the merits' 'has gradually undergone change,' [citation], and it has come to be applied to some judgments (such as the one involved here) that do *not* pass upon the substantive merits of a claim and hence do *not* (in many jurisdictions) entail claim-preclusive effect."  (*Semtek,supra*, 531 U.S. at p. 502, original italics.)

"In short, it is no longer true that a judgment 'on the merits' is *necessarily* a judgment entitled to claim-preclusive effect; and there are a number of reasons for believing that the phrase 'adjudication upon the merits' does not bear that meaning in Rule 41(b)."  (*Semtek, supra*, 531 U.S. at p. 503, italics added.)  The court stated that Rule 41(b) was merely a default rule for determining the import of a dismissal.  "This would be a highly peculiar context in which to announce a federally prescribed rule on the complex question of claim preclusion, saying in effect, 'All federal dismissals (with three specified exceptions) preclude suit elsewhere, unless the court otherwise specifies.' "  (*Ibid*.)

Also, using Rule 41(b) as a claim-preclusive rule in a diversity case could violate the federal Rules Enabling Act (28 U.S.C § 2072(b)) by abridging a party's substantive right under other state law to sue, and it could violate the federalism principal announced in *Erie Ry. Co. v. Tompkins* (1938) 304 U.S. 64, 78-80 [82 L.Ed. 1188] by engendering variations in outcomes between state and federal litigation which would likely influence the choice of a forum.  (*Semtek, supra*, 531 U.S. at pp. 503-504.)

"Finally," the court stated, and of relevance here, "[I]f Rule 41(b) did mean what respondent suggests, we would surely have relied upon it in our cases recognizing the

14

claim-preclusive effect of federal judgments in federal-question cases. Yet for over half a century since the promulgation of Rule 41(b), we have not once done so." (*Semtek, supra*, 531 U.S. at pp. 504-505.)

The Supreme Court found the key to interpreting Rule 41(b)'s "adjudication upon the merits" in Rule 41(a), which, "in discussing the effect of voluntary dismissal by the plaintiff, makes clear that an 'adjudication upon the merits' [under Rule 41(b)] is the opposite of a 'dismissal without prejudice[].' " (*Semtek, supra*, 531 U.S. at p. 505.) Under Rule 41(a), a voluntary dismissal in general is "without prejudice[.]" A dismissal without prejudice "is dismissal without barring the defendant from returning later, to the same court, with the same underlying claim. That will also ordinarily (though not always) have the consequence of not barring the claim from *other* courts . . . ." (*Ibid*., original italics.)

The Supreme Court concluded, "We think, then, that the effect of the 'adjudication upon the merits' default provision of Rule 41(b)—and, presumably, of the explicit order in the present case that used the language of that default provision—is simply that, unlike a dismissal 'without prejudice,' the dismissal in the present case barred refiling of the same claim in the United States District Court for the Central District of California. That is undoubtedly a necessary condition, but it is not a sufficient one, for claim-preclusive effect in other courts." (*Semtek, supra*, 531 U.S. at p. 506, fn. omitted.) *Semtek's interpretation of Rule 41(b) and the phrase "on the merits"* forecloses the Commission's assertion that the federal court's dismissal of plaintiff's federal claim and remand of her state claims precludes her from raising her state claims in state court. The dismissal, on the merits for the limited purposes of Rule 41(b), was not a judgment on the merits for purposes of federal claim preclusion law. At most, the federal court's order barred plaintiff from reasserting her claims in the federal District Court for the Eastern District of California. It had no claim preclusive effect on her state claims in superior court.

15

This result is consistent with the United States Supreme Court's counsel over many years that federal courts should remand or dismiss without prejudice any state law claims when federal question jurisdiction is lost so that the plaintiff may refile in state court.  (*Carnegie-Mellon University v. Cohill* (1988) 484 U.S. 343, 351 [98 L.Ed.2d 720]; *Rosado v. Wyman* (1970) 397 U.S. 397, 403-405 [25 L.Ed.2d 442]; *United Mine Workers v. Gibbs* (1966) 383 U.S. 715, [16 L.Ed.2d 218].)  That is what occurred here, and the trial court was not precluded by federal claim preclusion law from hearing the claims.

II

*Preclusive Effect of the Board's Decision*

The Commission contends that the Board's decision rejecting plaintiff's defense of retaliation in the appeal from her termination collaterally estopped plaintiff from litigating that issue in this action.  The Commission claims the Board's decision, which followed a full evidentiary hearing before an administrative law judge, decided the issues plaintiff raises here and was sufficiently judicial in character to meet the requirements of collateral estoppel.

The Commission recognizes that in *State Bd. of Chiropractic Examiners v. Superior Court* (2009) 45 Cal.4th 963 (*Arbuckle*), the California Supreme Court held that the Board's decision dismissing a retaliation complaint made to the Board did not preclude the victim from filing a damages action under the California Whistleblower Protection Act in superior court.  Indeed, following remand from the federal court, the trial court in this case overruled the Commission's demurrer and denied the Commission's motion for summary judgment against the complaint based on *Arbuckle*.  Each time, the court ruled that *Arbuckle's* rationale and the Legislature's intent expressed in the Act to authorize an action for damages meant the Board's decision could not have preclusive effect.

16

Before us, the Commission contends the trial court erred by not applying collateral estoppel.  It claims that the Board's hearing on plaintiff's appeal, like most other administrative decisions made after a quasi-judicial administrative hearing, met all the requirements for applying collateral estoppel to plaintiff's complaint.  *Arbuckle* does not apply, the Commission argues, because its holding is limited to its facts—findings made by the Board's executive officer after an investigation, not a decision by the full Board after an evidentiary hearing before an administrative law judge.

We conclude the reasoning of *Arbuckle* governs, and the Board's decision did not collaterally estop plaintiff from bringing this action.

A.      *Statutory background*

The Act prohibits retaliation against a state employee who reports wrongdoing by her employing agency and its employees.  (§§ 8547.3, 8547.4.)  The Act embodies a strong public policy to deter and punish those who retaliate against state employees for reporting wrongdoing.  "The Legislature finds and declares that state employees should be free to report waste, fraud, abuse of authority, violation of law, or threat to public health without fear of retribution.  The Legislature further finds and declares that public servants best serve the citizenry when they can be candid and honest without reservation in conducting the people's business."   (§ 8547.1.)

The Act authorizes a state employee who was injured due to her protected disclosure to initiate administrative and civil proceedings, in that order, to obtain redress.  To begin administrative proceedings, the injured employee files a retaliation complaint with the Board.  (§ 8547.8, subd. (a).)  The Board follows the procedures set forth in section 19683 to address the complaint.  (§ 8547.8, subd. (c) (§ 8547.8(c)).)  Section 19683 requires the Board to initiate a hearing or an investigation of the complaint within 10 working days of its submission.  (§ 19683, subd. (a).)  The Board's executive officer "shall complete findings of the hearing or investigation" within 60 working days

17

thereafter and provide them to the complainant and the accused party. (§ 19683, subd. (a).)

If the executive officer finds that the accused party retaliated against the complainant for engaging in protected whistleblower activities, the accused party may request a hearing before the Board. (§ 19683, subd. (b).) "The request for hearing and any subsequent determination by the board shall be made in accordance with the board's normal rules governing appeals, hearings, investigations, and disciplinary proceedings." (§ 19683, subd. (b).)

If, after the hearing, the Board determines that the accused party retaliated against the complainant, or if the accused party does not request a hearing and the findings of the executive officer conclude that retaliation occurred, the Board may order "any appropriate relief[.]" (§ 19683, subd. (c).) The relief may include reinstatement, backpay, restoration of lost service credit, compensatory damages, and the expungement of any adverse records of the complainant. (§ 19683, subd. (c).)

The executive officer may depart from the procedure just outlined, as the officer did in this case, if the allegations in the retaliation complaint are the same as those contained in another appeal to the Board. In that circumstance, the executive officer may consolidate the appeals "into the most appropriate format." (§ 19683, subd. (a).) If the officer consolidates the matters, the Board must render its decision within six months of the consolidation unless it extends the time. (§ 19683, subd. (a).)

Besides providing for administrative relief from the Board, the Act authorizes a complainant to file a civil action against the accused party. (§ 8547.8(c).) In the civil action, the complainant may obtain damages, and she may obtain punitive damages if the accused party's actions were malicious. The complainant is also entitled to reasonable attorney fees if she establishes liability. (§ 8547.8(c).)

This right of action, however, is conditional. The complainant may not file the action unless she has first filed a retaliation complaint with the Board "and *the board has*

18

*issued, or failed to issue, findings pursuant to Section 19683*." (§ 8547.8(c), italics added.)

B.    *Analysis*

At issue is whether collateral estoppel bars a damages action under the Act after the Board, following a contested evidentiary hearing, decided that no retaliation occurred. The evidentiary hearing on plaintiff's whistleblower complaint to the Board resulted when the Board's executive officer consolidated the complaint with plaintiff's appeal from her termination. Plaintiff appealed her termination under statutes outside of the Act, and those laws entitled her to an evidentiary hearing. (§ 19578.)

According to the parties, this case rises or falls on whether *Arbuckle* applies. The Commission argues its evidentiary hearing satisfied each of the requirements for collateral estoppel to apply, the policy for the doctrine supports applying it here, and that *Arbuckle* is limited to its facts and does not apply. Plaintiff, on the other hand, contends that *Arbuckle* governs our decision and prevents collateral estoppel from barring this action.

We turn our attention to *Arbuckle* and its progeny.

1.    *Arbuckle*

The California Supreme Court held in *Arbuckle* that the findings issued by the Board's executive officer on a whistleblower complaint under the Act, which became the Board's final decision, were the findings the Act required to be made before a complainant could bring a civil action. (*Arbuckle, supra*, 45 Cal.4th at p. 971.) Also, because the Act required only that the Board issue, or fail to issue, findings before the complainant could file the action, the complainant was not required to exhaust his or her administrative or judicial remedies before filing the action, and, of significance here, the Board's decision had no preclusive effect on the civil action. (*Id*. at pp. 975-976.)

19

In *Arbuckle*, the plaintiff's employment with the State Board of Chiropractic Examiners (chiropractic board) involved issuing citations for the unlicensed practice of chiropractic. The plaintiff learned that the chiropractic board's chairperson had failed to renew her license. The chairperson ultimately renewed her license, but the chiropractic board's executive director instructed the plaintiff not to issue a citation to the chairperson for the time she practiced under an expired license. Thereafter, the plaintiff's managers changed the plaintiff's duties and transferred her to a different unit, among other actions. (*Arbuckle, supra*, 45 Cal.4th at pp. 968-969.)

The plaintiff filed a retaliation complaint with the State Personnel Board. The Board's executive officer investigated the allegations and issued findings dismissing the complaint. (*Arbuckle, supra*, 45 Cal.4th at p. 969.) Instead of petitioning for a hearing before the Board, which at that time the Board's regulations allowed but the Act did not, the plaintiff filed a damages action under the Act. The chiropractic board moved for summary judgment, contending the plaintiff had not exhausted her administrative or judicial remedies and, as a result, the executive officer's decision precluded the plaintiff from bringing the action. (*Id.* at pp. 969-970.)

The trial court denied the chiropractic board's motion for summary judgment, and the California Supreme Court upheld the trial court's decision. Section 8547.8(c)'s precondition for filing a civil action required only for the Board to have "issued, or failed to issue, findings pursuant to Section 19683," nothing more. The statute's express reference to findings "pursuant to Section 19683" clarified "the precise type of findings that satisfy the caveat"—the findings section 19683, subdivision (a) required the executive officer to make. (*Arbuckle, supra*, 45 Cal.3d at p. 971.) "[S]ection 8547.8(c)'s express cross-reference to section 19683 indicates that this initial decision constitutes the 'findings' that satisfy section 8547.8(c)." (*Ibid.*) The court said that under the plain meaning of sections 8547.8 and 19683, "there was no legal impediment to [plaintiff's]

filing an action in the superior court immediately after receiving the State Personnel Board's adverse findings." (*Arbuckle, supra*, 45 Cal.4th at p. 971.)

Although exhausting administrative remedies is generally a prerequisite to obtaining judicial review of administrative findings, the Supreme Court held that section 8547.8(c) did not require exhaustion because it authorized a new action, not review of the administrative action. The court stated, "Section 8547.8(c) authorizes, not an action *to review* the decision of the State Personnel Board, but *a completely separate* damages action in the superior court in which the employee will enjoy all the procedural guarantees and independent factfinding that generally accompany such actions. Exhaustion of every possible stage of an administrative process is not particularly necessary where the civil action that the Legislature has authorized is not one to review the administrative decision, but rather a completely independent remedy." (*Arbuckle, supra*, 45 Cal.4th at p. 973, original italics.)

Moreover, the asymmetry of section 19683's administrative remedies made sense when considering the overall statutory scheme. "The employee is not bound by the State Personnel Board's decision, and therefore the Legislature gave the employee no statutory right to pursue an intra-agency appeal of the executive officer's findings. The Legislature, however, gave the board significant authority to take action against a retaliating party, including ordering specific relief and awarding compensatory damages. Therefore, to protect that party's rights, the Legislature authorized an intra-agency appeal available to that party only. ([] § 19683, subd. (b).)" (*Arbuckle, supra*, 45 Cal.4th at p. 973.) Thus, the plaintiff was not required to seek a hearing before an administrative law judge before filing her civil action. Receiving the findings of the Board's executive officer sufficed. (*Ibid.*)

The California Supreme Court further concluded that the plaintiff was not required to exhaust judicial remedies before bringing a civil action under section 8547.8(c), and the Board's decision had no preclusive effect on that action. The court acknowledged

21

that, generally, writ review of an adverse administrative decision is necessary before pursuing other remedies. The court also agreed that if a litigant does not take this step, and the administrative proceeding possessed the requisite judicial character, the administrative decision is binding in a civil action brought later in superior court. (*Arbuckle, supra*, 45 Cal.4th at pp. 975-976.)

"But," the court continued, "the Legislature expressly authorized a damages action in superior court for whistleblower retaliation (§ 8547.8(c)), and in doing so it expressly acknowledged the existence of the parallel administrative remedy. It did not require that the board's findings be set aside by way of a mandate action; rather, it gave as the only precondition to the damages action authorized in section 8547.8(c), that a complaint be filed with the board and that the board 'issue[ ], or fail[ ] to issue, findings.' (*Ibid.*) The bareness of this statutory language suggests that the Legislature did not intend the State Personnel Board's findings to have a preclusive effect against the complaining employee." (*Arbuckle, supra*, 45 Cal.4th at p. 976.) " ' "[A] court may not give preclusive effect to the decision in a prior proceeding if doing so is contrary to the intent of the legislative body that established the proceeding in which res judicata or collateral estoppel is urged." ' [Citations.]" (*Ibid.*)

The high court rejected any argument that its holding rendered the Board's action a " 'waste of time' and 'meaningless.' " (*Arbuckle, supra*, 45 Cal.4th at p. 976.) The Legislature had required or permitted disputing parties in other instances to complete a nonbinding adjudicative procedure before proceeding with a damages action. (See Lab. Code, §§ 98, 98.1, 98.2; Bus. & Prof. Code, § 6204, subd. (a).) "The Legislature may consider such nonbinding proceedings to be useful as a means of promoting settlement, and in many cases nonbinding proceedings may be an effective way of resolving minor disputes with minimal expense to the parties." (*Id.* at p. 977.)

The court also stated that holding the Board's findings to be preclusive in the damages action "would unduly restrict" access to the statutory right of action. (*Arbuckle,*

22

*supra*, 45 Cal.4th at p. 977.) Under the standards for ordinary or administrative mandate, it would be difficult for a complaining party to have the Board's adverse findings overturned. "Therefore, in nearly every case, an adverse decision from the board would leave the employee without the benefit of the damages remedy set forth in section 8547.8(c). . . . In such cases, the whistleblower employee's only remedy would be the documentary hearing before the State Personnel Board's executive officer, without even the opportunity to address the executive officer in a face-to-face discussion. Nothing in section 8547.8(c) suggests that the Legislature intended the damages remedy created in that provision to be so narrowly circumscribed . . . ." (*Ibid.*)

The Supreme Court also disagreed with the Court of Appeal's reasoning in reversing the trial court that an adverse decision by the Board would bar a damages action in superior court but a decision favorable to the whistleblower would not. The court found this analysis to contravene legislative intent. Because the Board has authority to award damages and to "order any appropriate relief" (§ 19683, subd. (c)), the high court said a favorable decision by the Board "would give the complaining employee a full recovery, and a civil action for damages under section 8547.8(c) would be unnecessary. Conversely, if the State Personnel Board's findings were even slightly adverse to the employee (i.e., awarding anything short of a full recovery), the State Personnel Board's adverse findings would, under the Court of Appeal's reasoning, have collateral estoppel effect, precluding any award of additional damages. [If that were so], the court action for damages that is authorized by section 8547.8(c) would be, to a large extent, superfluous. That result cannot be what the Legislature intended." (*Arbuckle, supra*, 45 Cal.4th at p. 978, italics omitted.)

The Supreme Court concluded "that section 8547.8(c) means what it says: An employee complaining of whistleblower retaliation may bring an action for damages in superior court, but only *after* the employee files a complaint with the State Personnel Board and the board 'has issued, or failed to issue, findings.' So long as the board has

23

issued findings (or the deadline for issuing findings has passed), the employee may proceed with a damages action in superior court regardless of whether the board's findings are favorable or unfavorable to the employee. Moreover, once the board has issued findings, the employee need not pursue additional administrative remedies and need not challenge the findings by way of a petition for a writ of administrative mandate." (*Arbuckle, supra*, 45 Cal.4th at p. 978, original italics, fns. omitted.)

In a footnote, the court stated that its opinion did not address the situation where, after the executive officer finds retaliation, the accused party appeals the officer's decision to the full Board while the complainant simultaneously pursues a damages action. The court said, "If the executive officer's findings are favorable to the employee, and the responding party has requested a hearing before the State Personnel Board, the question arises whether the employee can pursue a civil damages action even while the respondent's administrative appeal is pending, resulting in two parallel proceedings adjudicating the same dispute. That case is not before us, and we express no view on the matter." (*Arbuckle, supra*, 45 Cal.4th at p. 978, fn. 4.)

### 2. *Arbuckle's progeny*

Since deciding *Arbuckle*, the California Supreme Court and the Court of Appeal in the few cases that have addressed the issue have consistently held that an adverse administrative decision did not preclude a damages action under the Act, because the Legislature intended to provide a separate cause of action to a retaliation complainant. In *Runyon v. Board of Trustees of California State University* (2010) 48 Cal.4th 760 (*Runyon*), a professor filed an administrative complaint alleging he was removed as departmental chair because he disclosed improper conduct by a dean. An internal investigation concluded there was no retaliation. The professor responded with written objections, but the vice-chancellor of human affairs disagreed with him and found no

24

retaliation.  (*Id*. at pp. 763-764.)  The vice-chancellor's decision was the university's final decision regarding the complaint.  (*Id*. at p. 763, fn. 2.)

The professor filed an action under section 8547.12 of the Act, which extends whistleblower protection to employees of California State University.  (*Runyon, supra*, 48 Cal.4th at p. 764.)  Like section 8547.8, section 8547.12 authorized a civil action if the complainant filed a complaint with the university and the university failed to reach a decision within prescribed time limits or did not address the complaint to the complainant's satisfaction.  (*Id*. at pp. 767-768.)  Relying on *Arbuckle*, the California Supreme Court held that the complainant did not have to seek writ relief and the administrative decision had no preclusive effect on the damages action.  (*Id*. at pp. 773-775.)

The *Runyon* court based its decision on the Legislature's intent in the Act to provide a separate damages action.  It stated, "Like the parallel provision addressed in *Arbuckle,* section 8547.12, subdivision (c) authorizes a damages action by an alleged whistleblower whenever the employee has exhausted his or her internal remedies by filing an internal complaint with CSU and CSU has reached an adverse decision, i.e., has failed to 'satisfactorily address' the employee's complaint.  As in section 8547.8, the Legislature 'expressly acknowledged the existence of the parallel administrative remedy' yet 'did not require that the [administrative] findings be set aside by way of a mandate action . . . .'  (*Arbuckle, supra,* 45 Cal.4th at p. 976.)  As in *Arbuckle,* then, to hold an adverse administrative finding preclusive in the expressly authorized damages action would be contrary to the evident legislative intent."  (*Runyon, supra*, 48 Cal.4th at p. 774.)

The Supreme Court addressed a similar issue in *Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655 (*Fahlen*) and reached the same result.  In that case, a physician filed an action under whistleblower statutes affecting health care facilities, claiming a hospital's revocation of his staff privileges after an evidentiary hearing on

alleged misconduct constituted unlawful retaliation. The physician had not sought writ review of the hospital's decision before filing the action. The Supreme Court found he was not required to do so. (*Id*. at p. 667.)

Referring to *Arbuckle* and *Runyon*, the court stated it had on previous occasions found a clear legislative intent, whether express or implied, to permit a statutory whistleblower action without prior exhaustion of administrative and judicial remedies, even though there was a parallel administrative proceeding. (*Fahlen, supra*, 58 Cal.4th at pp. 670, 671-675.) Requiring exhaustion of judicial remedies before filing a separate retaliation action in this instance would compromise the legislative purpose of encouraging and protecting whistleblowers by providing for a separate damages action. (*Id*. at pp. 677-678.)

In contrast, the California Supreme Court relied on the lack of legislative intent for a separate damages action to hold that a final order from a federal administrative agency finding that no retaliation had occurred barred a state retaliation action. In *Murray v. Alaska Airlines, Inc.* (2010) 50 Cal.4th 860 (*Murray*), an airline employee raised safety concerns with the Federal Aviation Authority. After the airline closed the facility where the employee worked and did not rehire him, the employee filed an administrative complaint with the United States Secretary of Labor under a federal whistleblower statute alleging the airline retaliated against him. (*Id*. at p. 865.) The Secretary investigated the matter, determined that the plaintiff failed to establish a nexus between his protected activity and the adverse action taken against him, and dismissed the complaint. (*Id*. at pp. 865-866.) The Secretary notified the plaintiff that her decision would become final unless he timely requested a hearing before an administrative law judge. (*Id*. at p. 866.)

The plaintiff did not request a hearing, but instead filed a whistleblower action under Labor Code section 1102.5 in state court. The airline removed the action to federal court invoking diversity jurisdiction, and the district court granted summary judgment in favor of the airline based on collateral estoppel. (*Murray, supra*, 50 Cal.4th at p. 866.)

26

The Ninth Circuit Court of Appeals asked the California Supreme Court to determine whether the findings in the Secretary's final order were afforded issue-preclusive effect under California law. The high court held they were. (*Murray, supra*, 50 Cal.4th at p. 866.) The court relied on the "settled" rule "that the doctrine of collateral estoppel or issue preclusion is applicable to final decisions of administrative agencies acting in a judicial or quasi-judicial capacity." (*Id*. at p. 867.)

The court distinguished its decision from *Arbuckle*. In *Arbuckle*, the court had " 'specific statutory language suggesting that adverse findings by the State Personnel Board are *not* binding' " in a section 8547.8(c) damages action. (*Murray, supra*, 50 Cal.4th at p. 877, fn. 8, quoting *Arbuckle, supra*, 45 Cal.4th at p. 976, original italics.) Unlike in the case then before the court, " '[t]he bareness of this statutory language suggests that the Legislature did not intend the State Personnel Board's findings to have a preclusive effect against the complaining employee.' " (*Ibid*.)

The two published decisions from the Court of Appeal that address the Act's damages action involved administrative evidentiary hearings, and both followed *Arbuckle* to hold that the underlying administrative decision had no preclusive effect. In *Taswell v. Regents of University of California* (2018) 23 Cal.App.5th 343 (*Taswell*), a nuclear physician employed by the university reported safety issues to the school and to government agencies. The school placed him on paid leave and informed him it would not renew his employment contract. The physician initiated the university's grievance procedure, which resulted in an evidentiary hearing before a hearing officer. Under the governing regulation, the parties were represented by counsel, oral and documentary evidence was received, cross-examination was permitted, and the hearing was transcribed or recorded. Following the hearing, the hearing officer found that the university had not retaliated against the physician, and the school's vice-provost approved the decision. (*Id*. at pp. 348-349.)

The physician sued for retaliation under the Act and other whistleblower statutes. Section 8547.10 of the Act extends whistleblower protection to employees of the University of California and grants an employee a right of action after filing a complaint with the university and the university either rules against the employee or does not issue a decision. The university sought summary judgment, asserting the physician failed to exhaust his judicial remedies by seeking a writ of mandate and that the school's administrative decision barred the claims under res judicata and collateral estoppel. (*Taswell, supra*, 23 Cal.App.5th at p. 350.) The trial court granted the motion, but the Court of Appeal reversed.

Relying on *Runyon*, the Court of Appeal stated, "Given the Legislature's intent to permit such a lawsuit [under the Act], [the plaintiff] was not required to exhaust judicial remedies and challenge the administrative decision by filing a petition for a writ of mandamus. Furthermore, his claim was neither limited by the administrative decision nor otherwise barred by the doctrines of res judicata or collateral estoppel. (See *Runyon,* supra, 48 Cal.4th at p. 774 ['[a]n administrative finding will not be given preclusive effect in a later judicial proceeding . . . " ' "if doing so is contrary to the intent of the legislative body that established the proceeding in which res judicata or collateral estoppel is urged" ' " '].)" (*Taswell, supra*, 23 Cal.App.5th at p. 357.)

A panel of this court held that the Legislature's intent to provide a damages action thwarted a collateral estoppel defense. In *Cornejo v. Lightbourne* (2013) 220 Cal.App.4th 932 (*Cornejo*), the plaintiff, a state employee, filed retaliation complaints with the Board in 2004, 2005, and 2006 against her employing agency. The Board's executive officer issued inconclusive findings on the 2004 complaint and referred the matter to a hearing officer for an evidentiary hearing. At the time, Board regulations authorized the executive officer to "assign the case to an evidentiary hearing before a Board Administrative Law Judge" if the officer concluded that material questions of fact existed. (Cal. Code Regs., tit. 2, former § 56.2, subd. (l), Register 2002,

28

No. 33, Aug. 14, 2002).)  (Current regulations do not provide this option.)  The hearing officer consolidated the 2004 and 2005 claims for hearing and consolidated and stayed proceedings in the 2006 claim.  In 2008, the hearing officer dismissed about half of the allegations in the 2004 and 2005 complaints and set the remaining allegations for a further evidentiary hearing.  (*Id*. at p. 937.)

In 2009, the plaintiff requested that the Board close her three pending proceedings.  She claimed *Arbuckle* obviated her need to pursue administrative remedies beyond the executive officer's issuance of his initial findings before filing a damages action.  The Board granted her request, and the plaintiff filed an action under the Act.  (*Cornejo, supra*, 220 Cal.App.4th at p. 938.)  The employing agency demurred on several grounds, including that the Board's actions precluded the suit.  The trial court sustained the demurrer, but we reversed.

The agency contended that the case was distinguishable from *Arbuckle* because in its matter, the Board's executive officer issued findings in 2004 that further evidentiary hearings were necessary, and plaintiff thereafter " 'voluntarily participate[d] in an evidentiary hearing.' "  (*Cornejo, supra*, 220 Cal.App.4th at p. 944.)  The agency claimed this distinguished *Arbuckle* because "a plaintiff should not be allowed to abandon ongoing administrative proceedings without exhausting them and proceed de novo in superior court."  (*Ibid*.)  Importantly for our purposes, the agency also asserted that this distinction gave preclusive effect to the hearing officer's 2008 decision.  (*Ibid*.)

We disagreed with both contentions.  We stated the agency's purported distinction was "the classic distinction without a difference.  The further participation in administrative proceedings does not have any bearing on the Supreme Court's rationale, which is premised on the absence of any *legislative* intent that a plaintiff exhaust the administrative remedy beyond the issuance of findings even if the 2002 Regulations contemplated further administrative proceedings.  ([*Arbuckle*]*, supra*, 45 Cal.4th at p. 972 [].)  Once the Supreme Court made this clear in 2009, plaintiff was entitled to abandon

the unnecessary steps of the administrative process.  Similarly, the [agency's] argument that this distinction gives preclusive effect to the November 2008 decision is equally unavailing, because it does not affect the rationale premised on the independent nature of the judicial action and the absence in section 8547.8 of any requirement of writ review of Board proceedings." (*Cornejo, supra*, 220 Cal.App.4th at p. 944, original italics.)

The Ninth Circuit Court of Appeals has also concluded that the Board's decision after an evidentiary hearing has no preclusive effect in a damages action filed under the Act.  In *Wabakken v. California Dept. of Corrections and Rehabilitation* (9th Cir. 2015) 801 F.3d 1143, the appellate court, relying on *Arbuckle*, held that the Board's decisions on a retaliation complaint and on a defense of retaliation in a disciplinary appeal made after evidentiary hearings before an administrative law judge had no preclusive effect on the complainant's damages action under the Act.  (*Id*. at pp. 1149-1150; see *Bahra v. County of San Bernardino* (9th Cir. 2019) 945 F.3d 1231, 1234-1235 [review of county employee's termination by civil service commission in evidentiary hearing did not bar plaintiff from filing retaliation action under Labor Code section 1102.5, following *Taswell*].)

### 3.    *Legislative intent governs*

But for the legislative intent expressed in section 8547.8(c), collateral estoppel would preclude plaintiff from raising the issue of retaliation in her damages action. "Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings. [Citation.]  Traditionally, we have applied the doctrine only if several threshold requirements are fulfilled.  First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding.  Second, this issue must have been actually litigated in the former proceeding.  Third, it must have been necessarily decided in the former proceeding.  Fourth, the decision in the former proceeding must be final and on the merits.  Finally, the party against whom preclusion is

30

sought must be the same as, or in privity with, the party to the former proceeding. [Citations.]" (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, fn. omitted.) In her termination appeal to the Board, the Board actually, necessarily, and finally decided the issue of retaliation following a full evidentiary hearing. All the policies that support extending preclusive effect to final administrative decisions could apply here.

However, the Legislature intended for a state employee to have the right to bring a separate damages action whether the Board issued or did not issue findings on the employee's retaliation complaint. Thus, notwithstanding the policies in favor of applying collateral estoppel, the Legislature determined collateral estoppel would not apply in this instance. We " ' "may not give preclusive effect to the decision in a prior proceeding if doing so is contrary to the intent of the legislative body that established the proceeding in which res judicata or collateral estoppel is urged." ' [Citations.]" (*Arbuckle, supra*, 45 Cal.4th at p. 976.) Here, the Board issued findings on plaintiff's retaliation complaint, and under the Act and *Arbuckle*, plaintiff is entitled to file a damages action even though the Board issued its findings and made its ruling after an evidentiary hearing on both her complaint and her disciplinary appeal. To hold otherwise would impose collateral estoppel where the Legislature directed that it not apply.

The Commission argues that the Legislature has never articulated an intent to preserve a complainant's right to sue regardless of the Board's findings. It criticizes plaintiff for not citing to legislative history to show such intent, and it asserts that "no published California case has articulated any purported legislative intent to dispense with the doctrine of collateral estoppel in such cases."

The Commission also contends that *Arbuckle* does not show that the Legislature intended to preserve the damages action no matter the Board's decision because *Arbuckle* did not involve a quasi-judicial hearing. The Commission argues that by enacting the Act, the Legislature intended to preserve a damages remedy to whistleblowers who otherwise would not have an opportunity to have their retaliation claims heard in a

31

judicial or quasi-judicial evidentiary hearing, such as the plaintiff in *Arbuckle*. The Commission asserts that the Legislature did not articulate any intent to abrogate collateral estoppel in cases like this.

The Commission's arguments overlooks the Act's language and the case authority we have reviewed above. Section 8547.8 grants a retaliation complainant a right of action so long as she files a retaliation complaint with the Board and the Board "has issued, or failed to issue, findings pursuant to Section 19683." (§ 8547.8(c).) Section 19683 authorizes the Board to issue retaliation findings not only by its executive officer following his or her investigations (§ 19683, subd. (a)), but also when the officer consolidates the retaliation complaint with another pending appeal to be heard by the full Board or when the accused parties appeal the executive officer's finding of liability to the full Board. (§ 19683, subds. (a)-(c).) Although section 19683 uses the phrase "render[s] its decision" or "determines" instead of "findings" to describe the full Board's decision, for both of those determinations, the Board is required to issue findings of fact, and those findings on the retaliation complaint would thus be issued "pursuant to Section 19683," even though those findings were made following a quasi-judicial hearing. (§ 8547.8(c); see §§ 11425.50, subd. [a state agency that conducts an adjudicative hearing must include a statement of the factual basis for its determination in its written decision]; 18682 [when requested, the Board must make findings on any matter before it]; *California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 591 [the Board is subject to section 11425.50].) By granting a complainant a damages action when the Board issues findings in response to a retaliation complaint, no matter what those findings may be and whether they were issued by the executive officer or the full Board after an evidentiary hearing, the Legislature by implication removed the bar of collateral estoppel and res judicata from that cause of action.

Legislative history supports this determination. Prior to 2001, section 8547.8(c) conditioned the complainant's right to file a damages action on her first having filed a

retaliation complaint with the Board and "the board has failed to reach a decision regarding any hearing conducted pursuant to Section 19683." (Stats. 1999, ch. 673 (Senate Bill No. 951), § 6.) Under this statute, the plaintiff had no right of action unless the Board did not reach a decision from any hearing it conducted under section 19683.

In 2001, the Legislature amended the statute. It adopted the current language that conditions the complainant's right to file an action on her having first filed a retaliation complaint with the Board and "the board has issued, or failed to issue, findings pursuant to Section 19683." (Stats. 2001, ch. 883 (Senate Bill No. 413), § 3.) Under this language, the complainant now has a right of action even if the Board rules on her complaint. If the Legislature had intended for res judicata and collateral estoppel to operate, it would not have changed the wording in this statute, as the earlier statute rendered a Board decision preclusive by not providing a right of action if the Board issued a decision after a hearing.

The Commission's argument that *Arbuckle* does not apply also ignores the holdings in *Taswell* and *Cornejo*, the only published appellate opinions to date that address the preclusive effect of an administrative hearing's decision on a retaliation complainant's right to bring a damages action under the Act. Both appellate courts held that res judicata and collateral estoppel did not bar a complainant's damages action under the Act, even though the Board had addressed the retaliation complaint in an evidentiary hearing, because the Legislature intended for the complainant to have that right of action, as recognized in *Arbuckle* and *Runyon*. (*Taswell, supra*, 23 Cal.App.5th at p. 357; *Cornejo, supra*, 220 Cal.App.4th at p. 944.)

The Commission contends *Cornejo* does not apply because that case did not address whether findings after a "full evidentiary disciplinary hearing" barred the damages action. The Commission argues that a decision on plaintiff's disciplinary appeal should preclude the damages action even if the decision on plaintiff's retaliation complaint may not because the disciplinary appeal was a separate matter, plaintiff

33

voluntarily pursued the disciplinary appeal through a full evidentiary hearing, and in most cases outside of the Act, a decision on a disciplinary appeal after an evidentiary hearing is preclusive.

The distinction does not make a legally significant difference. None of the Commission's points refute the Legislature's intent that plaintiff and persons in her position be entitled to bring a damages action for retaliation even if the Board has ruled on the issue at an evidentiary hearing. That the Board addressed the matter in a disciplinary appeal as well as in the termination complaint hearing makes no legally significant difference.

The Commission claims that *Arbuckle* should be limited to its facts—a decision by the Board's executive officer without the benefit of an evidentiary hearing before an administrative law judge. The Commission argues that instead of relying on *Arbuckle*, we should follow the California Supreme Court's ruling in *Murray* because the plaintiff in that case voluntarily pursued a disciplinary appeal that he was not required to undertake. That point, however, was not the fact that drove the *Murray* court's decision. The court held that the federal administrative decision was preclusive because, unlike in *Arbuckle*, there was no indication that Congress or the Legislature intended that administrative decision not to be preclusive. (*Murray, supra*, 50 Cal.4th at p. 877, fn. 8.) And although *Arbuckle* addressed the executive officer's limited review, its declaration of the Legislature's intent to provide a civil right of action to persons who file a retaliation complaint with the Board governs this case. (*Auto Equity Sales, Inc. v Superior Court* (1962) 57 Cal.2d 450, 455.)

The Commission contends that applying *Arbuckle* here would create a system of unfair, piecemeal, and inconsistent resolutions. It would also place agencies in "impossible dilemmas" regarding managing their employees. If the Board upholds a termination but the terminated employee also brings a retaliation damages action, the employer must decide whether to rehire a "problem" employee to mitigate the

employee's damages or defend the litigation and risk losing at trial. We do not see this as being an impossible dilemma. These types of decisions are not uncommon in public employment litigation, especially when considering whether to settle an employee's claim.

For all these reasons, we conclude the *Arbuckle* doctrine governs this case, and the trial court correctly decided that the Board's decision on plaintiff's disciplinary appeal did not preclude this action.

### III

### *Inferences from Claim of Attorney-Client Privilege*

The Commission contends the trial court abused its discretion when, over the Commission's objections, it permitted plaintiff's counsel to question Commission witnesses about why they sought legal advice so that the jury could draw negative inferences from the Commission's exercise of the attorney-client privilege. The Commission also claims the court abused its discretion when it refused a number of times to issue a mandatory curative instruction to address counsel's actions as required by Evidence Code section 913 (section 913).

We agree the trial court erred and the error was prejudicial.

A. *Background*

Plaintiff's counsel sought to establish that the defendants knew as early as June 2010, when Crista Hill forwarded the letter from plaintiff's union representative to defendants Armstrong and Pope, that plaintiff had requested the state auditor to audit the Commission, and that her request led to the defendants deciding to terminate plaintiff's employment at that time, not later or for different reasons as the defendants had claimed. To establish the point, counsel relied on emails exchanged in June between Armstrong, Hill, and others regarding a memo they were preparing to send to DPA seeking legal

35

advice. Counsel's questions regarding the emails and regarding the defendants' intent for seeking advice drew many objections, but the trial court overruled most of them.

Armstrong testified that she learned in January 2010 that a Committee member, Michael Kaufman, and plaintiff had complained to Pope, Dale Janssen and a commissioner that Armstrong had lied to the Commission in August 2009 about the backlog of cases. Armstrong learned in April 2010 that Senator Steinberg was proposing an audit of the Commission. Armstrong and Janssen met with the senator's staff to have the audit postponed.

Armstrong testified that she first spoke about a disciplinary action against plaintiff in September 2010 with Pope. She denied speaking about it in June 2010. Plaintiff's counsel asked Armstrong to look at trial exhibit 29. Exhibit 29 was an email dated June 9, 2010, from Armstrong to Hill, with copies to Janssen and Pope. The subject was "CONFIDENTIAL KC allegations." An attachment to the email was referenced as "CONFIDENTIAL KC allegations.docx." In the email, Armstrong wrote, "I made edits per Dale's suggestion. Crista, I think this is ready to send to DPA. When you do, can you get an idea of the time frame for them to review and get back to us?"

Plaintiff's counsel asked Armstrong what were the "confidential KC allegations" she had mentioned in the email. Armstrong stated they were questions about ethical concerns she and others had regarding plaintiff and her role as a Commission attorney. Armstrong denied those concerns regarded plaintiff's interaction with Senator Steinberg's office and the state auditor. At that time, Armstrong did not know that plaintiff had had any interactions with the senator or the auditor. She believed Kaufman had requested the audit. Four months earlier, Armstrong had concluded that plaintiff was behind Kaufman's allegations. But Armstrong did not think plaintiff, a Commission attorney subject to the attorney-client privilege, would go to the state auditor.

At this point, plaintiff's counsel asked Armstrong to review trial exhibit 30. Exhibit 30 consisted of Hill's June 9, 2010, response to Armstrong's earlier email of that

day, and another response by Armstrong to Hill about an hour later. Counsel read out loud the contents of Armstrong's second email: "I agree with your edits (good catches) and your cover letter. Thanks for getting this over there as soon as possible."

Counsel then asked Armstrong what the personnel matter was regarding plaintiff in June 2010. Armstrong stated they had questions about plaintiff's ethical responsibilities; it was not about discipline.

Outside the presence of the jury, plaintiff's counsel complained that the Commission had not produced the document that the emails in exhibits 29 and 30 referenced. The Attorney General, who represented the Commission at trial, said she had produced all the documents she had, and neither she nor Armstrong possessed the document mentioned in the emails. The court asked the parties to find the document.

The following day, the Attorney General informed the court that during the administrative hearing before the Board five years earlier, the emails and the attached document came up in questioning. The Commission at that time asserted the attorney-client privilege in writing and provided a privilege log. The administrative law judge sustained the objection, and the issue had not been raised since then. And at the next day of trial, the Attorney General provided the court with a copy of two privilege logs from the Board hearing and a letter. The Attorney General argued that the document attached to the emails was privileged because it had been incorporated into something that was sent by the Commission to outside counsel.

The Attorney General conceded that the Commission had produced and disclosed the emails that were exhibits 29 and 30 as part of discovery for the Board hearing. The emails themselves did not reveal the privileged content and they were exchanged only between Commission employees.

The court asked if the document that had been attached to the emails concerned how the Commission could best prepare for the notice of adverse action it would file against plaintiff. The Attorney General stated the attachment had nothing to do with the

37

adverse action. He could not disclose what it concerned without violating the privilege, but he could say it was a memo to DPA requesting legal advice and setting forth the issues for which they sought advice. It was not related to plaintiff's adverse action or firing.

Plaintiff's counsel argued he had a right to know what personnel action the Commission was consulting about with DPA in the memo. The trial court disagreed. It asked, and counsel agreed, that even if the memo concerned taking adverse action against plaintiff, the content of the communication would be protected by the attorney client privilege. The court stated that once the Commission asserted the privilege, the court and counsel could not do anything about it, even though plaintiff questioned the credibility of the witnesses that were testifying concerning the document.

During redirect examination of Armstrong, plaintiff's counsel established that on June 7, 2010, Armstrong received from Hill a copy of the letter from plaintiff's union representative that the independent investigator had forwarded to Hill three months earlier. In that letter, plaintiff's representative informed the investigator that plaintiff was dissatisfied with the investigator's interview. Plaintiff had also said it might be best if the state auditor was asked to investigate. Armstrong acknowledged that from this letter, she knew that plaintiff was talking about going to the state auditor in June. She did not know, however, that plaintiff had already contacted the auditor.

Counsel asked Armstrong to look again at trial exhibit 29. The questioning continued thus [there is confusion in the record over the exact dates counsel mentions]:

"Q. So June 8th at 6 o'clock you hear about [plaintiff] talking about the Bureau of State Audits. June 9th at 11:43 in the morning, you and Crista Hill are communicating about something you're going to ask the DPA to do, correct?

"A. Yes

"Q. And what was it that you wanted help from the DPA on?

"[Attorney General]: Objection. Privilege.

38

"The Court: Well, in terms of that question, that question is permissible.

"The witness: We wanted the DPA's legal advice.

"[Plaintiff's counsel]: You wanted the DPA's legal advice because you were contemplating taking action to terminate [plaintiff's] employment; isn't that correct?

"A. That's not true.

"Q. Well, the DPA is the State agency that provides advice to other people in State service about disciplining employees, correct?

"A. It provides a myriad of advice to the – all State agencies that request it. We pay them for the advice. They're in essence our outside counsel for that purpose. And a question for legal review could be about several different subjects.

"Q. So just to refresh your recollection, were you thinking about giving [plaintiff] a pay raise?

"A. No.

"Q. A promotion?

"A. No.

"Q. Giving her extra vacation time?

"A. No.

"Q. Giving her a bigger office?

"A. No.

"Q. I'm just not understanding what the alternative would be as to why you're contacting DPA about [plaintiff] the very day after you learn that she's threatened to go to the Bureau of State Audits?

"[Attorney General]: Objection. Misstates testimony.

"The Court: Overruled.

"The Witness: Is there a question there?

"[Plaintiff's counsel]: Isn't it true that you were talking about asking DPA for advice about how to fire [plaintiff]?

39

"A. No."

The following day at trial, the Attorney General requested that the trial court instruct the jury under section 913. Subdivision (a) of that statute states, "If . . . a privilege is or was exercised not to testify with respect to any matter, or to refuse to disclose or to prevent another from disclosing any matter, neither the presiding officer nor counsel may comment thereon, no presumption shall arise because of the exercise of the privilege, and the trier of fact may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding." If the privilege is invoked, at the request of counsel, the court must instruct the jury that no presumption arises because of the exercise of the privilege and the jury may not draw any inference therefrom regarding any matter at issue in the proceeding or the credibility of a witness. (Evid. Code, § 913, subd. (b).)

The Attorney General argued that over her objection based on privilege, plaintiff's counsel violated section 913's prohibition with his questioning of Armstrong the previous day, and she asked the court to instruct the jury accordingly. The court disagreed.

"The Court: I don't think she asserted the privilege.

"[Attorney General]: We asserted the privilege as to –

"The Court: Right. There was never a privilege asserted – generally what happens in that scenario is that the witness takes the stand, they're asked a question, whether or not it's a Fifth Amendment or any other privilege, I refuse to answer that question. That didn't happen yesterday. [¶] Now, if it turns out that something like that takes place, we can deal with that with an instruction to the jury."

Plaintiff's counsel raised similar questions of intent with other witnesses. When questioning Hill about exhibit 29, counsel asked if Armstrong was stating in the email that she had edited the memo Hill had prepared to send to DPA. The Attorney General objected, claiming the question violated the privilege, and she asked for "the 913

40

instruction." The court said counsel was asking only what the email said, not for any other comments or commentary.

Later, over the Attorney General's objection, counsel repeatedly asked Hill what her intention was for contacting DPA. The dialogue went thus:

"Q. And when you requested advice from [DPA], you were not seeking to reward [plaintiff], were you?

"[Attorney General]: Objection. Refers to privileged conversation.

"The Court: Overruled.

"The Witness: Can you repeat the question?

"The Court: You're asking what her intent was?

"[Plaintiff's counsel]: Yeah.

"[Plaintiff's counsel]: Q. Was it your intent to reward [plaintiff]?

"A. We were seeking advice on her current situation.

"Q. I'm asking you about your intent. Were you intending to reward [plaintiff]?

"[Attorney General]: Objection. Vague.

"The Witness: I don't know how to respond to that. Personally, no.

"[Plaintiff's counsel]: Q. I mean were you asking about a pay raise? Was it your intent to give her a pay raise?

"A. We generally wouldn't have those conversations with DPA.

"Q. Were you intending to give [plaintiff] a promotion?

"[Attorney General]: I would object to this whole line of questioning.

"The Court: Overruled. Overruled.

"The Witness: No.

"[Plaintiff's counsel]: Q. No. Give her a larger office?

"A. No.

"Q. More days off?

"A. No.

"Q. What was your intent? Your intent was to discipline [plaintiff], wasn't it?

"A. We were having conversations –

"[Attorney General]: Objection, you Honor.

"The Court: Overruled."

Hill ultimately stated she "personally had no intent. [¶] . . . [¶] It was to seek legal advice."

Plaintiff's counsel questioned Pope in a similar manner. Counsel asked Pope whether he knew the emails in exhibits 29 and 30 were about plaintiff. The Attorney General objected based on attorney-client privilege and requested a section 913 instruction. The court sustained the objection and directed the jury to disregard the last question. It did not, however, give the section 913 instruction. When counsel asked Pope what his personal intention was regarding plaintiff at that time, the Attorney General objected. This time, the court overruled the objection. Pope said they were seeking advice from an outside source on an ethical matter. When counsel asked him again what his personal intention was at that time, the Attorney General objected based on attorney-client privilege, and the court sustained the objection.

The Attorney General also raised objections to plaintiff's counsel's line of questions in a motion for nonsuit and at a later hearing prior to jury instructions. The court stated that counsel in his questions was referring to the intent for seeking advice from DPA, which would preexist any type of confidentiality.

In closing argument, plaintiff's counsel argued that exhibits 29 and 30 showed that Armstrong and Pope testified untruthfully when they said they did not know plaintiff had contacted the state auditor until November 2010 when they served the notice of action on her and that they thus could not have terminated her for being a whistleblower. Defendants saw plaintiff's union representative's letter in June which mentioned plaintiff's proposal to contact the Bureau of State Audits. Exhibits 29 and 30 showed that after receiving the letter, the defendants contacted DPA. Counsel stated the court was

42

careful not to allow inquiry into any actual communication with DPA, but the court did allow counsel to question the witnesses about their intent when they were having these conversations in June. Counsel claimed that each of them said they had no intent at that time. But once they saw the union representative's letter, the defendants "escalated their attack" on plaintiff. The Attorney General did not object to this argument.

After the close of evidence, the court gave its instructions to the jury. The instructions included CACI No. 215, the form instruction on exercise of a privilege. The court stated, "A witness or party may have an absolute right not to disclose what they told their attorney in confidence because the law considers this information privileged. Do not consider, for any reason at all, the fact that a witness or party did not disclose what they told their attorney. Do not discuss that fact during your deliberations or let it influence your decision in any way."

B.       *Analysis*

The Commission contends the trial court erred by repeatedly permitting plaintiff's counsel to draw negative inferences from the Commission's invocation of the privilege and by refusing to issue the mandatory curative instruction under section 913 when requested. The Commission argues that the court permitted plaintiff's counsel to invite the jury to infer that because the defendants were communicating with attorneys in June 2010, they must have been intending to retaliate against plaintiff at that time. The questioning forced the defendants to decide whether to incur the negative inferences or disclose the content of the privileged memo to rebut counsel's assertions.

The Commission asserts that counsel's closing argument exacerbated the harm. In his argument, counsel referred to the fact that the Commission had asserted the privilege, and then used the fact that defendants could not answer without violating the privilege to argue that they must have been lying. That the defendants were communicating with attorneys showed they had "escalated their attack" on plaintiff.

43

The Commission also contends the trial court erred when it did not give the instruction mandated by section 913 at the time the Commission exercised the privilege and requested the instruction. And the court's ultimate instruction using CACI No. 215 did not cure the prejudice. The instruction did not explain to the jury that they could not draw any negative inference, as required by section 913. Also, the instruction came far too late for it to cure the prejudice that had already occurred.

We agree with the Commission that the trial court erred.

"The attorney-client privilege, one of the oldest recognized, allows a client to refuse to disclose, and to prevent others from disclosing, confidential communications with an attorney. (Evid. Code, § 954.) The 'fundamental purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters.' (*Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 599.) The privilege is absolute . . . ." (*People v. Bell* (2019) 7 Cal.5th 70, 96.) It "prevents disclosure of the communication regardless of its relevance, necessity or other circumstances peculiar to the case." (*Kerner v. Superior Court* (2012) 206 Cal.App.4th 84, 111.)

Once the privilege has been established, the trial judge or counsel for any party may not comment on the fact that a party or witness has exercised the privilege. (Evid. Code, § 913, subd. (a).) Furthermore, "[t]he jury may not draw any inference from a witness's invocation of a privilege. (Evid. Code, § 913, subd. (a); *People v. Mincey* (1992) 2 Cal.4th 408, 441.) Upon request, the trial court must so instruct jurors. (Evid. Code, § 913, subd. (b); *People v. Mincey, supra*, 2 Cal.4th at p. 441.)" (*People v. Doolin* (2009) 45 Cal.4th 390, 441-442.)

Section 913 adopted the holding in *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106] (*Griffin*). *Griffin* prohibited the prosecution from commenting on a criminal defendant's exercise of his Fifth Amendment right not to testify. (*Id.* at p. 613.) Section 913 applies the *Griffin* rule to all privileges.

44

Under *Griffin* jurisprudence, the rule precluding comment by court or counsel on the exercise of the privilege against self-incrimination may not be circumvented through indirect comment. Thus, in *People v Gioviannini* (1968) 260 Cal.App.2d 597, the prosecutor in a murder case referred to the fact that only two persons knew the true facts, and one was dead. The court held that this and similar comments violated the *Griffin* rule as "implied invitations to the jury to draw inferences damaging to the defense, not from the general state of the evidence but specifically from appellant's failure to present himself as a witness." (*Id*. at p. 604; see also *People v Mesa* (2006) 144 Cal.App.4th 1000, 1005-1006 [prosecutor's comment that "unless we have an explanation, then you'll know [defendant] is guilty" was improper].)

Here, by questioning the witnesses about their intentions for seeking legal advice in June 2010 and about specific reasons the witnesses may not have been seeking legal advice, plaintiff's counsel impliedly invited the jury to infer that the witnesses sought legal advice for terminating plaintiff's employment within two days of learning plaintiff had threatened to contact the state auditor. Counsel sought for the jury to draw this inference from the witnesses' seeking legal advice and exercising their right at trial not to disclose the intentions or purposes for seeking that advice.

Counsel's closing argument exacerbated the harm. He effectively argued that the defendants' seeking legal advice in June, as established by exhibits 29 and 30, showed that they knew then that plaintiff had talked about going to the state auditor, and that they lied when they testified of not having any particular intent when they sought legal advice. The Commission did not object to this argument, but by then, an objection would have been futile. The court had repeatedly overruled the objections to questions about defendants' intent for seeking legal advice, and the Commission could reasonably believe the court would have overruled that objection again during the argument. We do not require parties to make futile objections to preserve claims of misconduct arising in closing arguments. (See *People v. Potts* (2019) 6 Cal.5th 1012, 1035.)

Counsel's actions put defendants in an untenable position. They could avoid the negative inference raised by counsel's questions only by disclosing their specific reasons for seeking legal advice, effectively waiving the attorney-client privilege by disclosing the contents of their communication with counsel. It was this choice that section 913 was enacted to prevent. According to legislative comment on the statute, "If comment could be made on the exercise of a privilege and adverse inferences drawn therefrom, a litigant would be under great pressure to forgo his claim of privilege and the protection sought to be afforded by the privilege would be largely negated. Moreover, the inferences which might be drawn would, in many instances, be quite unwarranted." (Assem. Com. on Judiciary, com. on Evid. Code, § 913, reprinted at 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 913, p. 245.)

Yet, because defendants chose not to waive the privilege and the trial court did not sustain objections under section 913, the jury was left with counsel's questions and argument to infer that defendants sought legal advice to terminate plaintiff for being a whistleblower in June 2010, an inference that would damage the defendants' position in the litigation.

The trial court's distinction between a persons' intent for seeking legal advice and the content of the persons' actual communication to obtain advice did not adequately protect the attorney-client privilege. Disclosing a specific reason for seeking advice will invariably disclose the contents of the communication to the attorney. While the reason itself may not be a protected communication, in this instance, counsel inquired into the intentions of the witnesses in order to disclose the contents of the communication or at least to have the jury infer that the communication dealt with discipline of the plaintiff. This circumvention of the attorney-client privilege is not allowed.

After the close of evidence and the completion of arguments, the court did instruct the jury with CACI No. 215 as part of giving all the jury instructions. The instruction told the jury not to consider, for any reason at all, the fact that a witness or party did not

46

disclose what he or she told the attorney, and not to discuss that fact during deliberations or let it influence their decision in any way. Traditionally, "[a]bsent some contrary indication in the record, we presume the jury follows its instructions (*NBC Subsidiary (KNBC–TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1223; *People v. Hardy* (1992) 2 Cal.4th 86, 208) 'and that its verdict reflects the legal limitations those instructions imposed' (*Saari v. Jongordon Corp.* (1992) 5 Cal.App.4th 797, 808)." (*Cassim v. Allstate Insurance Co.* (2004) 33 Cal.4th 780, 803-804.)

This presumption, however, may be rebutted. "In some circumstances, courts understandably find grounds to consider this presumption rebutted—when the risk that the jury will not follow instructions is sufficiently pronounced. (See *Bruton v. United States* (1968) 391 U.S. 123, 135-136 [88 S.Ct. 1620, 20 L.Ed.2d 476 ['[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.'].) But we tend to apply such exceptions narrowly and do not extend them without good reason." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 205-206.)

Good reason for not relying on the presumption exists here. Because counsel had been allowed to ask so many questions about the defendants' intentions for seeking and not seeking legal advice, the risk that the jury would ignore the eventual instruction was high. Although section 913 does not state when a court must give the mandated instruction, as this case demonstrates it is far better practice to give it when privilege questions arise during the evidentiary phase of the trial as well as with the other instructions after the evidence has been presented to avoid the problems encountered here.

The errors here went to the crux of the case. Plaintiff had to show she was terminated because she engaged in whistleblowing, and the inferences counsel invited the jury to make based on the defendants' exercise of the attorney-client privilege in early

June 2010 established the required element.  No other evidence made the point as strongly.  Human resources manager Hollingsworth testified that in a second June 2010 meeting, the defendants decided to layoff plaintiff, but that was not a disciplinary action. It is thus reasonably probable that had the errors not been made and the jury not been invited to infer that the defendants agreed to terminate plaintiff in June 2010, the Commission would have obtained a more favorable verdict.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  Finding the error to be prejudicial, we reverse the judgment.

## DISPOSITION

The judgment is reversed.  Costs on appeal are awarded to defendants Armstrong, Pope, and the Commission.

_____
HULL, Acting P. J.

We concur:

_____
MAURO, J.

_____
MURRAY, J.